Bentley, J.
I will say at the start that the condition of the plaintiff’s pleadings in this case, of course, is not such as to permit them to be commended as models for a basis upon which to carry forward the inquiries which we have finally permitted in the case; but the parties were before us, and as we thought we discerned in the pleadings the controversy which they really had, we formerly entered an order in the case respecting the injunction that had been allowed by the court of common pleas, and subsequently referred certain matters to a referee. We have concluded that the matter should be settled in the present case, and by a decree of the court.
Several of the important questions arising in this case were considered at some length when, on a former occasion, the motion to suspend the operation of the injunction granted by the common pleas was presented to us, and our views regarding them were stated when we allowed that motion. Thereafter, in consonance with those views, we ordered a reference for the ascertainment of certain facts which we considered it proper and necessary to know in finally determining the case, the proofs regarding which, but for the reference, we should have heard here in court on the trial. Our investigation of the case since its final submission has necessarily led us through the same fields as those traversed before, as well as others, and we are still impressed with the correctness of the general conclusions already announced, *533 and that the pleadings present a basis for the inquiry as to what particular poles the plaintiff seeks to use, the owners and condition of the same, whether they are in the streets under such circumstances that the qity may lawfully grant to an electic lighting company other than the present owners and ocupants thereof, n.náin invitum as to them,the right jointly with them to use such poles to string electric wires upon for lighting either public or private buildings with electricity; whether the plaintiff has been lawfully granted such right by the city authorities, wherever such joint use is practicable, and if so, the amount which the plaintiff should pay for such use before entering upon it, and to whom payment should be made.
The defendants urge that if such use of their poles can be acquired, it must be by proceedings for appropriation in the probate court, and that a court of equity would have no jurisdiction of the case to determine the amount, unless by some contract, express or implied, the defendants have waived, forfeited or granted away their common law right to hold their property exempt from such seizure until it has been regularly appropriated under the statute in the probate court, and its value assessed by a jury, and paid. And, in the sense in which we construe it, this proposition is correct, and this leads to the inquiry which lies at the main root of the controversy, whether by voluntary act, viewed with reference to the facts and laws, these defendants have subjected their property to the liability of being thus practically taken without the compensation therefor being ascertained by a jury.
To determine this, a brief review of the laws bearing upon the matter will be requisite. It seems to have been always assumed by the legislature that municipal authorities would not have authority under their general powers as to streets,to allow telegraph, telephone and electric light poles to be placed in the streets, and from time to time statutes have *534 been passed conferring upon them certain powers in this respect. And in this connection I call attention to the sections of the Revised Statutes from 3454 to 3471 a inclusive.
And in 5 Ohio Circuit Court, 340, it was held by the Circuit Court of Hamilton county, that until the act of May 12, 1886, municipal corporations had no power to allow in the streets poles and structures for electric light and power purposes. This holding has the apparent sanction of the Supreme Court, since it affirmed the judgment of the circuit court in that case, but without report.
The act of 1886 now appears in Smith & Benedict’s Statutes as section 8035-233, and provides as follows:
“That a company organized for the purpose of supplying electricity for power purposes and for lighting the streets and public and private buildings of a city, village or town, may manufacture, sell and furnish electric light and power required therein for such and other purposes, and such companies may construct lines ,for conducting electricity for power and light purposes, through the streets, alleys, lanes, lands, squares and public places of such city, village or town by the erection of the necessary fixtures, including posts, piers and abutments necessary for the wires, with the consent of the municipal authorities of the city, village or town, and under such reasonable regulations as they might prescribe. Provided, that all wires erected and operated under the provisions of this act shall be covered with a water-proof insulation, and said poles,piers, abutments and wires shall be so located and arranged as not to interfere with the successful operation of existing telephone and telegraph wires.”
It becomes important to consider the scope and meaning of the words “with the consent of the municipal authorities * * * and under such reasonable regulations as they may prescribe. ’ ’
It is evident that this power of regulation is something more than the city might exercise under its general authority over the streets, since if it means no more than that, the insertion of those words in the. statute would have been un *535 necessary, which the rules for the interpretation of statutes will not permit us to presume. Do these words confer the power to allow other electric companies to share in the use of such poles and structures when it would be practicable, and to prescribe reasonable terms and conditions upon which the added use may be had;? In this connection I will call attention to the case already mentioned of Brush Electric Light Co. v. Jones Bros. Electric Light Co. et al., 5 O. C. C. R. 340. In that case, after the court had announced what I have already mentioned, that there was no power previous to this act to entitle municipal authorities to grant the right to use the street for these purposes, on page 343 the court say this:
“There is nothing whatever to show, that after power was given to the municipal authorities to make such grant, any action required by these two sections was taken. And it is difficult to see how the alleged grant of this franchise is to become valid and binding on the city, or the public, by a mere acquiescence of the public authorities in its use for a while, when the statute is express that it can be granted in but one mode.
“But there is no such proof of continued acquiescence on the part of the municipal authorities as justifies the claim of the plaintiff. It is shown that on the second of November, 1889, the Board of Public Affairs directed the'city engineer “to withdraw all permits to erect electric light poles, heretofore used, until further orders;” and on November 3, 1889, such board by resolution provided that they would permit only one line of poles for electric lighting or power purposes, to be erected on any one street. And the board also provided thereby, among other things, that where any street was already occupied by such line of electric poles, that it would allow the company to whom the prior permit was granted, to maintain the line of poles, and would authorize any other company to which a permit had been granted to occupy portions of such territory, to use the poles already on the street, under the terms of the general ordinance of the •city. And in a subsequent clause it is provided that when *536 a street is so occupied, tbe second company applying for the privilege, will be authorized, so far as the chief electrician and chief engineer may deem the same practicable, to occupy the iines of poles of any other company that may be upon the street * * * under the terms of the general ordinance.
“This general ordinance referred to is dated October 18, 1889, and contained substantially similar provisions, and fixed the terms upon which other companies might use the poles of the company which had erected them, viz: by paying a fair proportion of the original cost of the erection thereof, and a monthly rental equivalent to a fair proportion of the cost of the erection and maintenance thereof.
“Under this action of the Board of Public Affairs and of tbe council, it is shown that the plaintiff company has obtained permission to erect by far the larger number of its poles now in the streets of the city, and that the defendant companies have also received like permits, and particularly that they have been authorized by the Board of Public Affairs and its engineer to occupy the poles of the plaintiff, the use of which by them, the plaintiff company is seeking to enjoin, and have offered to comply with the terms fixed by the ordinance. It would seem, then, from the statements, that the plaintiff company is occupying the streets of the city, not under a valid or irrevocable grant, but by the mere license and permission of the municipal authorities, and which license is coupled with the condition, impliedly at least, accepted and acted upon by such company, that other companies to which like permits should be granted, should have the privilege of stringing its wires thereon. Can it claim not to be bound by this condition?”
And further on, at the bottom of page 344 and top of page 345, the court say:
“But tbe resolution of the Board of Public Affairs, under which the plaintiff company is now operating, made it a condition that the poles erected by it, should be subject to the use of other companies, to whom permits to occupy portions of such territory had been granted. And such permits have been given to these two companies, as is conceded, and this would seem to estop the plaintiff from saying that they are not so authorized. ’ ’
*537 On page 346 is this paragraph:
“It seems to us manifest that it is, and it should certainly be the law, that the right to decide as to the use of the streets of a city by the corporations of this character, should be entrusted to the municipal authorities, and the use thereof by such companies, in the language of the statute, should be ‘under such reasonable regulations as they may prescribe.’ The idea that any number of such companies may erect their poles in the streets as they please, of course cannot be tolerated. It would be destructive to the interests of the public. It would seem that the regulations and provisions under which these companies are now using the streets of the city are reasonable and proper — but if not, it can only be said that the plaintiff has accepted the license subject to those terms, and must abide by them, so far as this case is concerned. ”
And thus they hold, it seems to us, that there being no authority prior to the act of 1886 for the municipal authorities to grant this right to use its streets for this purpose, if for any reason, or under an ordinance, (as there was one passed in that case,) poles had been erected in the streets,and were existing at the time that the act of 1886 was passed, these poles, under such circumstances, must be regarded as existing in the streets by the mere sufferance of the city authorities and that therefore they might require them to be removed as being there without authority, or they might annex to their maintenance there, such conditions as the municipal authorities might deem it be reasonable.
In that case it would seem that the permit which the court held effective and binding was not a permit of the council itself by a valid ordinance, since the ordinance which was passed seems to have been conceded to be invalid on account of some informality in its passage, but the permit was the permit of the Board of Public Affairs, without which, to be sure, a valid ordinance could not be passed, but which in and of itself has no power to pass a binding ordinance. This *538 permission had been granted by such a board in that case, and the court hold that the companies having allowed their poles either to be erected under that permit, or having maintained their poles afterwards without any permission at all, it must be held that they were occupying the streets subject to the -regulation of the Board of Public Affairs. The court, as seen, deals somewhat with this statute as to interpretation, and in the last paragraph the court say, “The use, therefore, by such companies, in the language of the statute, should be ‘under such reasonable regulations as they may prescribe. ” And the indication is that if these regulations had been reasonable, they would have bound these companies as to these poles, although they had not specially consented to them or bound themselves to abide by the regulations.
In this connection I also call attention to the case of the Kinsman Street Railway Co. v. The Broadway & Newburg St. Ry. Co. et al., 36 Ohio St. 239. , I will read from the opinion, beginning at the bottom of page 250, where the court say:
“While we think that it was not within the power of the municipal authorities, by such agreement, to confer upon the plaintiff the right to use these streets for railroad purposes, to the exclusion of all other persons or corporations, if the public welfare or convenience should require a further similar use; we also think that no such exclusive right was intended to be conferred. If an exclusive privilege was intended, it should have been expressed, and we find in the ordinance and resolutions relied on, not only the absence of such expression, but, on the other hand, a different intention indicated. In the ordinance of September 20, 1859, it was declared that “any company organized for the purpose of laying down rails and running street passenger cars to be drawn by horses or mules through the streets of Cleveland, shall be guided, governed and regulated by the conditions (therein expressed) and such restrictions as the council may hereafter pass. ” And in the resolution of October 25, 1859, *539 containing the grant of right to the plaintiff specially, it is provided that the right is granted “under the terms and conditions prescribed by said ordinance” (of September 20., 1859), “or which may hereafter be prescribed by the city council.” And a like stipulation is contained in the subsequent resolutions authorizing a change of route. We have no doubt, that under the power thus stipulated for (if such reservation had been at all necessary) the municipal authorities might at any time thereafter (if it'was thought the public convenience required it) grant the like privilege to another company to use and occupy the same streets, and indeed the same route, for railroad purposes, to be used in common with the company or companies to whom the privilege was first granted. ”
And on page 252:
“When, therefore, a right of way for street railroad purposes is granted over the same route to another company by the municipal authorities, the private property of the former cannot be appropriated by the latter company until compensation is first paid by the latter to the former company. And, in the absence of a stipulation to the contrary, it is quite clear to our minds, that the municipal authorities had no more power to fix the amount of the compensation that ■should be paid by the latter to the former company for the right of the joint use of such material, than it has to determine the compensation to be paid to other owners of private property taken for the same public use. In such case, if no ■agreement be made between the companies as to the matter of compensation, or the same be not assessed by a jury as in other cases of the condemnation of private property to public uses,the latter company should be enjoined from the forcible appropriation.
“But in this case we find a stipulation to have been made; namely, that the plaintiff would lay its tracks under the terms and conditions prescribed by the ordinance of September 20,1859,or which might thereafter be prescribed by the city council; and, also, that the East Cleveland Street Railroad Company (a corporation then in existence) should be *540 allowed the use of the plaintiff’s track upon reasonable terms, to be prescribed by the council, unless agreed upon by the parties. The right of the council to prescribe ‘terms and conditions’ in the future, it seems to us, was sufficiently broad to cover a future exigency like the one then existing, and specially provided for; namely, an exigency arising from the necessity to provide for the public welfare by running the cars of other street railroad companies over the track of the plaintiff. And this being so, the only question remaining is, was the condition as to the compensation to be paid by the Broadway & Newburg Company to the plaintiff reasonable? In other words, was the compensation, as fixed by the council, fair and adequate? Upon this question issue was joined, but no testimony offered. The burden of showing its inadequacy rests upon the plaintiff. Under these circumstances, the injunction prayed for must be denied.”
A study of that case will show this: that the particular stipulation that the council might itself fix the compensation, did not apply, and was not made to apply especially to the company in question,but to another company; and the judgment must be supported upon the idea that the agreement that the council might prescribe terms and conditions was sufficient authority for the council, in fixing ‘terms and conditions,” to fix what was regarded as a reasonable compensation for the use of the property thus appropriated.
In the present case the ordinances which have been received in evidence do not go to the extent that the ordinances did in that case, but in that case there was no such statute as applies here; and the terms of the statute of 1886 in this respect seem to us as full and as ample as the provisions o£ the ordinances in this case in 36 Ohio St. So that here, instead of placing and maintaining the poles in the street under an implied agreement by accepting some ordinance allowing the council to fix terms and conditions for placing and maintaining them, the defendants maintain them under the general provisions of the law of the state, which would allow the council to permit them to be placed and maintained *541 iii the streets under such reasonable regulations as the city authorities might impose.
The question as to some of these poles, at least, is, whether the power thus given in the statute of 1886 is to be regarded as a continuing power, or whether it must be exercised, if exercised at all, in fixing terms and conditions at the time that a permit is given to the companies to occupy the streets. If it is such a continuing power of regulating, does it so involve the power to fix reasonable terms upon which another company may use the poles, and justify the imposition of such reasonable terms upon the companies at any time for maintaining those poles? We have, upon such study as we have been able to give to it — and we have given a great deal —come to the conclusion that this statute in that respect is one that has a continuous operation. In view of the fact that the council has no power to grant an exclusive right in the streets, in view of the terms of the statute itself, in view of the public exigencies that must necessarily arise and may be supposed and presumed to arise, and should have been within the view of the legislature at the time it passed the stat ute, we must conclude that this provision of the act of 1886 is so continuing in its nature and scope that the council may regulate the use of these poles from time to time. Such regulation, of course, must always be reasonable, and must be had with a view to the rights and equities of those maintaining the poles.
As to this branch, we think the case in 55 N. W. Rep. cited by counsel may be of service. This was a case where the Supreme Court of Michigan finally enjoined the use by a subsequent company of the poles of the persons who had placed them in the streets before that; but in the course of the argument the idea upon which the court seemed to act all through finally appears. I call attention to a paragraph beginning on page 454, in which the’court say this:
“ Defendant Sands claims that there was a committee of *542 the council empowered to act in the matter after this resolution was passed, and such committee could fix the manner of the use.
There was a provision, simply, that they might use the poles already in the streets under the direction of a committee of the council.
“The committee was known as the ‘street lighting committee, ’ but nothing appeared of record in the proceedings of the common council empowering this committee to act or to make any regulations for the use of the poles. It is contended, further, by the defendant Sands, that after the resolution was passed, he called upon the president of the complainant company, and was told by him to designate any poles he wished to use for public lighting, and he could use them, and that he would be charged in proportion to the number of wires used; and that, acting under this, and the direction of the committee, he attempted to put up the cross arms, when he was stopped by the injunction. There is no claim, however, on the part of the defendant that any arrangement was consummated with Mr. Hart,president of the company, as to the manner of the defendant’s use of the poles, or the manner of stringing the wires. The committee of the council who directed Sands to go on with the work and use the complainant’s poles,do not pretend that any regulations were adopted or the manner of their use fixed by the committee,or how many wires were tobe placed on the poles, or where located. There can be no doubt that under the charter provisions the common council had the power to pass the ordinances above set out, and to grant the franchise to the complainant, with the resolutions therein contained. After this was done, however, and the complainant had erected the poles, the council could not, by this resolution, do what was attempted to be done there, without first fixing in a definite way the use which it was attempted to confer upon defendant Sands. The power to make such reasonable regulations for the use of the poles is lodged by the statute in the council, and cannot be delegated to a committee. The language of the statute is that such corporation shall have power to lay, construct, and maintain, conductors for conducting electricity through the streets, etc., ‘with the consent of *543 the municipal authorities thereof, under such reasonable regulations as they may prescribe.”
These are almost identically the words used in the Ohio statute in 1886. On page 455 the court proceeds:
“We are not able to say from this record that a joint use cannot be made of the poles by the Sands company and the complainant. If such joint use appeared conclusively to us to be dangerous, we should unhesitatingly set the ordinances and resolutions aside, granting to Sands any use of the complainant’s poles. We are not, however, satisfied upon that point, and shall in the present case only decide the resolution unreasonable, as not providing proper regulations for a joint use. ”
The court proceeds to hold that on account of a want .of provisions for definite regulations, that the parties could not go on and use the poles already in the streets, and the concluding paragraph is as follows:
“For the reason pointed out, the decree of the court below must be reversed, and decree entered here in favor of complainant, restraining defendant, Sands, from using its poles until the city, by its council, shall, after notice to the parties interested, adopt suitable rules and regulations for such joint use.”
In effect the Supreme Court of Michigan held that under a jirovision almost identical with the words of the Ohio statute of 1886, the council had the right and power to provide that existing poles in the streets might be used by another company or person for its or his electrical purposes; it holding in the particular case that there was a defect in the proceedings, not because the council has no power to grant it under those terms, but because they had not provided reasonable regulations, and that that must be done by the council; that the committee to which'this matter was referred had no power to exact any terms, or to fix them, and that, in fact, they did not fix them, but under the terms granted by the committee, the defendants might go on and use all of the *544 poles that Sands had put in the streets, to the utter exclusion of Sands, and without any regulations"whatever. But the case in this respect is in line with our conclusion regarding the scope and effect of this statute of 1886, viz: that it confers a power and a continuing power upon the common council, to provide that another company may use the poles already in the streets, where it is practicable, and to fix the terms.
It was necessary, in order to sustain the plaintiff’s case as to all these poles, to find an underlying power of this nature that would affect all of the poles which were sought to be taken. That is, there were some of these poles that were not erected under the permission given by the officers of the city; some of them were erected by the Consolidated Company, and some of them had been in the street before that time; and it was sought to take some poles to which these permits accepted by the Consolidated Company, could not apply. Of course, the foregoing reasoning would affect all poles sought to be taken. There would be this additional reason in the matter of the poles which had been erected under the permits granted by the city civil engineer and superintendent of the fire alarm telegraph, that the Consolidated Company, having accepted that permission, had under it erected certain of its poles. As to the poles thus erected, whatever may be said as to the absolute authority of these officers to finally fix the rules and regulations under which the poles might be erected in the streets, yet they did assume to fix certain terms. In the Cincinnati case the Board of Public Affairs fixed certain terms under which it would permit the occupancy of the streets. It had no power in and of itself, and alone, to pass upon this matter finally, and yet the circuit court in that case, and apparently with the sanction of the Supreme Court, hold that that being the only permit under which the particular poles were erected, it was not competent for the parties themselves accepting those terms' *545 to say that they erected the poles without any conditions, and were not bound by the conditions which they had accepted. So we think that, so far as the poles were erected by the Consolidated Company, it was in apparent acquiescence with and under the terms of its permits, and after they had been obtained, it must be presumed that they acquiesced in the permission, whatever it was, and agreed to its terms.
But it is said now, even if this were true, that this regulation here is improper and inadequate, because the municipal authorities themselves — that is, the city council — have not regulated'these matters, and that the case in Michigan would apply, and render these proceedings on the part of the plaintiff improper, This case differs from that in several respects as to the matter now under consideration. In the case there, it is said that the council had not conferred upon the committee any power whatever to make any regulations. In this, by a specific ordinance, the council had granted to these two officers of the city the power to grant these permits and to make certain designations in the permits. In that case it was said that there was nothing to prevent the defendants from utterly excluding the former owner of these poles from their use. In this case it is not sought by the plaintiff to have an exclusive use, but the application is for a joint and equal use of the poles. By the authority granted to the plaintiff by the ordinance in this case, there is this restriction: They can use the poles existing in the streets only in case the same is practicable; and under that term “practicable” we think there is quite a range of inquiry. If parties had already set in the streets certain poles which they were rightfully and lawfully using, it certainly could not be. held to be practicable for any officer or any authority to oust such parties entirely from the use of the poles, and give them exclusively to the applying person or corporation. In this case not only must the permits be given by two officers supposed *546 to be skilled in matters of this kind, in the first place, but after the erection of the structures, and after everything is supposed to be ready for use, then there must be an inspection by these city officers, under the direct authority of the city, and they must certify in writing before the use commences, that these structures thus placed are proper and practicable. Under guards of this kind, we are unable to see that the same state of circumstances is presented as in the Michigan case. So wje think that there is a right and a power, under certain conditions and restrictions, for the plaintiff to acquire the right to use these poles.
We referred to the referee certain questions that it would be necessary for us to pass upon. I will first state, however, a little more directly, that m our view of the matter, in erecting these poles, or continuing to use them after the passage of the law in 1886, the companies owning them not only devoted them to public uses,but having erected or continued the use of them under the statute, that they thereby gave the municipal authorities the right of a continuous reasonable regulation.
Theymust be held to have acquiesced in that, and to have put their poles in the street,and maintained them there, with reference to that power, which might at any time be exercised. We,are not certain but that the council, and we think, under the holding in 36 Ohio St., that the council, perhaps, might have provided, either by itself or some agency, some manner of fixing the compensation in the first place; and that if that had been paid or tendered, the parties’ right to go into the use would have been perfect, in case the compensation thus fixed was reasonable — leaving, of course, the right to the owners of the poles to have objected, and to apply to a court for the purpose of determining that question.
We regard this case here as one of this sort; the plaintiff had the right, under certain circumstances and reasonable regulations, to go into a joint use of these poles,[if it were practicable, yet it was its duty, first, to attempt, in the ab *547 sence of any regulation by thejcouncil allowing’it to fix compensation, to agree with the owners respecting the compensation; and that failing, it was not necessary for the plaintiff to go into the probate court, as in a condemnation proceeding, but it might apply to a court of equity to determine the rights of the parties in this regard. So this court, acting under that view of the case, referred the question of compensation, as well as certain other facts which we ought to know, to a referee. The referee has reported, among other things, that it is practicable to use these poles as is suggested and asked. And we take it, that that being practicable, the use is reasonable, and that it will not improperly or unjustifiably interfere with the use which the defendants may make of the poles. He has reported the ownership of the poles, the present use to which each pole is subjected, and what he finds is a reasonable compensation for the use which the plaintiff seeks. We have seen no reason for disturbing any of the findings that the referee has made in these respects.
• And now, if we are right in these propositions, it follows that if the plaintiff shall pay or tender the amount of this compensation thus fixed, which we must deem reasonable, and shall pay such of the expenses and costs as the court may adjudge, it will have a right then to enter upon this use. It will be remembered that this use must still be had under the continual and continued supervision of these two officers, and before anything can be done by way of using these structures, they must certify that the structures are proper and practicable and reasonable in effect.
The decree of the court will be entered as thus outlined — > confirming the report of the referee, finding these amounts to be the reasonable compensation that must be paid, and that upon its actual payment or tender, and the payment of the costs to be adjudged against the plaintiff, it may enter upon this use of these poles specified in the report of the referee.
*548 As to the matter of costs it is to be considered that in this case the proceeding in this court is largely of the same nature that a case for appropriation would be,if prosecuted in the-probate court; and there, if the petitioner cannot agree with the-opposing party as to the value and as to the use and the taking of the property, he must apply to the probate court, and there such proceedings are had as shall fix the amount of compensation, and then he must pay it, and he must pay the costs of the proceeding when thus ascertained. And in analogy to what the statute provides, and perhaps in fairness and justice, the plaintiff should pay all the costs that would be necessarily and properly made in a proceeding of this kind. We have considered whether or not there were any of these costs that the court should pick out and differentiate, that would not come under this general statement now made. To be sure, this case has been fought with great tenacity, and it has been denied that tliere is any such power which the court has found to exist; but ihat controversy has employed more the efforts of counsel than it has the augmented the actual costs that would be taxable in a proceeding of this kind. The things that we-referred to the referee, for instance, were matters that it was necessary for him to find, and it was necessary by reason of the paintiff’s application here to fix them; and we think that the costs made before the referee were fairly and necessarily and properly made in determining the questions that were submitted to him. And the costs of this court — -the taxable costs — would necessarily be attributed largely to the same matter of contest between the-parties. We have therefore come to the conclusion that the-plaintiff should pay the costs of this proceeding which are-taxable. The costs that would be ordinarily taxable in a case if it were in the probate court will be included in this-order. What expense there may be by way of stenographer, whether that might or might not be taxable as costs in this-; *549 case, we have not determined. As we referred this matter to the referee, he perhaps would have been justified in writing out this testimony in long-hand; but we are not at all certain but that’he might have been justified in employing a clerk to write in long-hand. We understand that a stenographer was in fact appointed or acted in the matter, perhaps by the concurrence of the parties. The statutes as to stenographers as applying to this court are in a very deplorable state, and how much of those costs would be taxable in our court it is difficult to say. If not directly taxable, whether or not they should be all taxed against the plaintiff is something we have not discussed at great length, and it is a matter that is still open.
John F. Kumler and Hurd, Brumback & Thatcher, for plaintiffs.
Doyle, Scott & Lewis, King & Tracy, B. B. Kinhade and Baker, Smith & Baker, for defendants.